UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:24 CR 527 MAL (JMB) |
| | ) | |
| SHAMEEK RIVERS, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Currently before the Court are two written motions filed by Defendant Shameek Rivers, namely a Motion to Dismiss [ECF No. 32] and a Motion to Suppress Evidence [ECF No. 33].  Also pending is an oral motion, namely a Motion to Suppress Statements [ECF No. 39].  The government opposes each motion.  Pretrial motions were referred to the undersigned United States Magistrate Judge.  See 28 U.S.C. § 636(b).

**PROCEDURAL BACKGROUND**

Rivers is charged by Indictment with being a felon in possession of a firearm.  The charge relates to events occurring in the early morning hours of August 12, 2024, in Hazelwood, Missouri. On September 16, 2025, the undersigned held an evidentiary hearing on the suppression motions; the parties agreed that the Motion to Dismiss did not require an evidentiary hearing.  Rivers was present with his attorney, Assistant Federal Public Defender Tara Crane, and the government was represented by Assistant United States Attorney J. Christian Goeke.  At the hearing, the government presented evidence and testimony through Hazelwood Police Department Officer Lucas Claborn.  [See ECF No. 40, Clerk's Witness List]  The government also introduced Officer

Claborn's body camera recording.  [See ECF No. 41, Clerk's Exhibit List – Gov't Exh. 1]

Based on the testimony and evidence from the evidentiary hearing, including the opportunity to observe the demeanor and evaluate the credibility of the witness, having reviewed the exhibit, and having considered the parties' arguments and written submissions, the undersigned makes the following findings of fact, conclusions of law, and recommendations.

## FINDINGS OF FACT

Lucas Claborn is a patrol officer with the City of Hazelwood, Missouri, Police Department. As of the evidentiary hearing, Officer Claborn had about three years of law enforcement experience. Officer Claborn's duties include responding to calls for service and patrolling within the city limits.

Shortly after midnight on August 12, 2024, Officer Claborn was dispatched to the parking lot of a hotel located on Dunn Road, in Hazelwood. According to Officer Claborn, he was dispatched to check on a "suspicious" vehicle parked in the hotel parking lot, but the primary concern was for the welfare of the person in the driver's seat of the vehicle who was motionless. Officer Claborn testified, and his body camera recording confirms, that when he arrived, there was a silver Dodge backed into a parking spot in the hotel lot, with the driver's door open. Officer Claborn credibly testified that he had concerns that the driver could be suffering from a medical emergency, a drug overdose, or some other serious condition. Officer Claborn parked his patrol vehicle behind the Dodge, separated by a large grass median in the parking lot. Another officer (Officer Cayabyab) arrived and parked to the left of the Dodge. The Dodge was not blocked in by either patrol vehicle.

As Officer Claborn approached the open door, he observed a handgun with an extended magazine in plain view on the driver's lap. The driver was later identified as Defendant Shameek

2

Rivers.[1] For safety purposes, Officer Claborn took possession of the firearm and gave it to Officer Cayabyab who rendered it safe. Officer Claborn testified that it was unusual for a person to have a firearm in that manner, unholstered and left unsecured in such a conspicuous manner. At about this same time that Officer Claborn removed the firearm, Rivers woke up.

Officer Claborn asked Rivers for his driver's license. In the body camera recording, Rivers can be seen shuffling through some items and then producing a Missouri Non-Driver's ID card; he did not produce a driver's license. Rivers told Officer Claborn that he had a room at the hotel and showed a key. Officer Claborn credibly testified that, in his experience, it was uncommon for someone with a hotel room to sleep in their car in the parking lot of the hotel. Based on the circumstances, Officer Claborn suspected that Rivers had been driving without a driver's license.

After Rivers provided his ID card, Officer Claborn returned to his patrol car while Officer Cayabyab waited with Rivers. Officer Claborn testified that he used a computer in his patrol car to check Rivers' ID and observed that Rivers had multiple arrests and warrants. He also testified that he could select items to find more information, and by using that method he saw Rivers had a prior felony conviction. Officer Claborn testified that it was unlawful under both state and federal law for a convicted felon to possess a firearm. Officer Claborn testified that he believed he had probable cause to arrest Rivers, but that it was his practice to have dispatch confirm whether a person had any felony convictions or active warrants.

While waiting on dispatch, Officer Claborn returned to the Dodge and asked Rivers to exit the vehicle. Rivers complied and Officer Claborn placed him in handcuffs and advised him that he was being detained pending further investigation. Officer Claborn immediately asked Rivers a few questions about Rivers' criminal history and whether Rivers knew he should not possess a

---

[1] Officer Claborn testified that he had no prior familiarity or contact with Rivers.

3

firearm.  Rivers confirmed he had a conviction and was aware he cannot possess a firearm.  At that point, Officer Claborn formally arrested Rivers for unlawful possession of a firearm.  Shortly thereafter, dispatch confirmed that Rivers had a felony conviction.  Officer Claborn also testified that there were warrants for Rivers' arrest out of the City of St. Louis.

Rivers was placed in Officer Claborn's patrol car.  During that time Rivers made numerous statements, mostly pleading for a break from Officer Claborn.  Rivers' statements included comments that could reasonably be interpreted as acknowledging that he possessed a firearm.

The officers left Rivers in the patrol car and returned to search the Dodge for other weapons.  They did not find any other firearms, but they located a firearm magazine in the glove box of the Dodge.  While they were searching Rivers' Dodge, Rivers managed to escape from the backseat of Officer Claborn's car and fled on foot.  The officers apprehended Rivers after a foot chase.  Rivers made additional spontaneous statements about having been to jail before, being scared, and having done time, among other things.

Additional findings of fact are included in the discussion below.

## DISCUSSION, CONCLUSIONS OF LAW, AND RECOMMENDATIONS

**I.      Motion to Dismiss** [ECF No. 32]

The Indictment charges Rivers with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).  Rivers contends that this charge is unconstitutional as applied to him. Rivers recognizes that his motion to dismiss is presently foreclosed by Eighth Circuit caselaw. See United States v. Jackson, 110 F.4th 1120 (8th Cir. 2024), cert. denied, 145 S. Ct. 2708 (2025). In view of the status of the law in our Circuit, the undersigned respectfully recommends that the Court deny Rivers' Motion to Dismiss.

**II.     Motion to Suppress Evidence** [ECF No. 33]

4

A.     **Summary of Arguments**

Rivers advances several related arguments in his motion to suppress the firearm evidence. First, he argues that, once the officers determined no emergency existed (i.e., Rivers was not in need of aid), the encounter should have been terminated because there was no reasonable suspicion to continue any investigation. Per Rivers, the officers should not have kept the firearm and asked for his ID while they further investigated the situation. Next, Rivers argues the fact that he produced a Non-Drivers ID card did not provide a reasonable suspicion that he had unlawfully operated the car he was found in. And, per Rivers, even if he lacked a license, it is not unlawful for an unlicensed driver to sleep in an unmoving vehicle or to operate a vehicle in a private parking lot. Rivers also argues that, even if Officer Claborn's mistakenly believed that Rivers was violating the law, it would have been an unreasonable mistake and not excused under the Fourth Amendment.

Rivers further argues that the officers seized his person before they had any reasonable suspicion of any crime. Rivers contends that several factors weigh in favor of that conclusion, including the retention of his ID card, the presence and position of the officers, and the failure to terminate the encounter after the initial purpose—a welfare check—was completed. Thus, per Rivers, he was unconstitutionally detained before the police learned of his criminal record. Rivers ultimately contends that the firearm and magazine were the fruit of an unconstitutional seizure and must therefore be suppressed.

The government counters that Officer Claborn observed the firearm in plain view while conducting a welfare check and, therefore, he could lawfully seize it. The government further contends that Officer Claborn did not violate the Fourth Amendment by requesting Rivers' driver's license and conducting a criminal history check. Per the government, it was constitutionally

5

reasonable to verify Rivers' identity and status before returning the firearm him. It is also the government's position that the circumstances, including the fact that Rivers produced a non-driver's identification card, provided a reasonable suspicion that Rivers had operated the vehicle without a license. And that reasonable suspicion further supported the decision to conduct a criminal history check, which revealed that Rivers was a convicted felon. Having learned that Rivers had a felony conviction, Officer Claborn had probable cause to arrest him. The government argues that the officers had probable cause to search Rivers' vehicle pursuant to the automobile exception to the warrant. Finally, the government argues that, even if the encounter was unconstitutional, Officer Claborn's discovery of arrest warrants would attenuate the taint pursuant to Utah v. Strieff, 579 U.S. 232, 238 (2016).

**B.   Discussion**

Rivers does not contend that the police engaged in any unconstitutional conduct regarding their initial contact with him. Similarly, he does not contend that the police could not seize the firearm at the outset of the encounter for safety purposes.[2]

---

[2] The police did not enter into a private residence, where heightened Fourth Amendment concerns may be at issue. Rather, they encountered Rivers in the driver's seat of an open vehicle in a hotel parking lot. See Caniglia v. Strom, 593 U.S. 194, 199 (2021) (limiting the reach of Cady v. Dombrowski, 413 U.S. 433, 441 (1973), noting that what is reasonable for vehicles is different from what is reasonable for homes). It is not disputed that police were dispatched due to a concern for a person's well-being. Vehicle searches in such circumstances are typically constitutionally reasonable. Although the police could have opened the vehicle door had it not been open, in this case, they observed Rivers asleep or unconscious, with a pistol having an extended magazine on his lap. See United States v. Smith, 820 F.3d 356 (8th Cir. 2016) ("Community caretaking functions are performed by law enforcement to 'help those in danger.'") (quoting United States v. Quezada, 448, F.3d 1005, 1007 (8th Cir. 2006)). Officer Claborn could seize the firearm, which he observed in plain view, for officer and public safety purposes during the encounter. At the time Officer Claborn seized the firearm, it was the middle of the night, and he was encountering an unknown person in an unknown condition. See United States v. Warren, 984 F.3d 1301, 1304 (8th Cir.) (explaining that, during a lawful traffic stop, officers can take actions that are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop'") (quoting United States v. Hensley, 469 U.S. 221, 235 (1985)), cert. denied, 142 S. Ct. 124

6

Rivers argues that Officer Claborn should have ended the encounter and returned the firearm once he determined that Rivers did not need aid and was just sleeping in his car. Per Rivers, the police lacked any reasonable suspicion to extend the encounter and to ask for identification. The undersigned agrees with the government and finds that, given the circumstances, it was constitutionally reasonable to determine Rivers' identity and take certain, minimally invasive steps before returning the firearm to Rivers.

First, the undersigned finds that Officer Claborn had a reasonable suspicion to extend the encounter beyond merely determining whether Rivers was in need of medical or other emergency assistance. Pursuant to Terry v. Ohio, 392 U.S. 1, 30 (1968), police officers may briefly detain a person based on reasonable suspicion "that criminal activity may be afoot." United States v. Davison, 808 F.3d 325, 329 (8th Cir. 2015) (citing Terry). "[A] Terry stop is justified only when the officer points to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Harvey, 1 F.4th 578, 581 (8th Cir. 2021) (citations and internal quotations omitted). "A reviewing court must look at the totality of the circumstances, allowing officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" Id. (citations and internal quotations omitted); see also United States v. Schaefer, 64 F.4th 1004, 1008 (8th Cir. 2023) (explaining that, "even if individual pieces of information … amount to little more than a hunch or are otherwise consistent with innocent activity, we look at the information as a whole, not in fragmented parts") (citations omitted).

"As a standard for initiating an investigative stop, reasonable suspicion hovers well below

---

(2021).

preponderance of the evidence and need not rise to the level of probable cause." McElree v. City of Cedar Rapids, et al., 983 F.3d 1009, 1015 (8th Cir. 2020) (citing United States v. Arvizu, 534 U.S. 266, 274 (2002)). "Importantly, even if '[a]ll of [defendant's] conduct was by itself lawful,' reasonable suspicion may still exist—if conduct is 'ambiguous and susceptible of an innocent explanation' as well as a criminal one, 'officers [can] detain the individuals to resolve the ambiguity.'" United States v. McMillion, 101 F.4th 573, 576-77 (8th Cir.) (quoting Illinois v. Wardlow, 528 U.S. 119, 125 (2000)), cert. denied, 145 S. Ct. 403 (2024). Thus, while "an 'inchoate hunch' does not equate to reasonable suspicion, the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." United States v. Mosley, 878 F.3d 246, 251 (8th Cir. 2017) (citation and internal quotations omitted).

The facts and circumstances of Rivers' situation are similar to those present in United States v. Harris, 747 F.3d 1013 (8th Cir.), cert. denied, 574 U.S. 910 (2014). In Harris, the police were called to the lobby of a bus station where a man was asleep on a bench with a firearm sliding out of his pants. Id. at 1015-16. The police approached the man, retrieved the gun and took steps to verify his identity. The Eighth Circuit held that these steps were all reasonable under the Fourth Amendment pursuant to the "'community caretaking' aspect of local law enforcement as those activities that are 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" Id. at 1017 (quoting Cady, 413 U.S. at 441). In Harris, the Eighth Circuit noted that the Terry reasonable suspicion rubric was relevant in this non-investigatory context. In particular, the Court explained that "[a] search or seizure of a person by a police officer acting in the officer's noninvestigatory capacity is reasonable if the governmental interest in the police officer's exercise of [the officer's] 'community caretaking function,' based on specific articulable facts, outweighs the individual's interest in being free from arbitrary

8

government interference." Id. (internal quotations and citations omitted).

In Rivers' case, the totality of the circumstances include several specific and articulable important facts that raise the level of suspicion beyond a mere hunch. The officers were called to the scene in the middle of the night.[3] When they arrived, the car door was open, Rivers was inside shirtless, asleep, with a loaded pistol on his lap. It was not just any pistol, but a pistol with an extended magazine. When he awoke, Rivers advised that he had a room at the hotel and was tired after work. In other words, rather than return to his room and get some rest, Rivers elected to sleep in the parking lot, with a loaded gun on his lap. In such circumstances, Officer Claborn could reasonably take additional steps, including seizing the firearm and confirming Rivers' identity. See Harris, 747 F.3d at (1018, 1019) (noting that careless handling of a firearm dictated that the officers take action to protect the public and the officers, and verifying the person's identity "was reasonably related to the circumstances justifying the encounter"); see also United States v. Munoz, 134 F.4th 539, 542-43 (8th Cir. 2025) (citations omitted) United States v. Mathes, 58 F.4th 990, 993 (8th Cir. 2023); United States v. Allen, 43 F.4th 901, 907 (8th Cir. 2022); United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998).

But even if Officer Claborn lacked a reasonable suspicion the moment that he observed the loaded gun with the extended magazine, Officer Claborn did not violate the Fourth Amendment in requesting Rivers' identification because Rivers has not established that he was "seized" at the time of that request. Under the Fourth Amendment, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude

---

[3] The totality of the circumstances considers the time of day or night, and the location of the suspected parties, such as whether the events occurred in a high-crime area. See United States v. Redman, 39 F.4th 1030, 1033 (8th Cir. 2022).

9

that a 'seizure' has occurred." Florida v. Bostick, 501 U.S. 429, 434 (1991). The Supreme Court has "held repeatedly that mere police questioning does not constitute a seizure." Id. Thus, merely requesting a person in a parked car for a driver's license does not constitute a seizure. See United States v. Campbell-Martin, 17 F.4th 807 (8th Cir. 2021) (explaining that asking questions and requesting identification was not a seizure where the officer parked two parking spots away, did not display a weapon, and did not convey a message that compliance was required), cert. denied 143 S. Ct. 86 (2022); see also United States v. Lillich, 6 F.4th 869, 876 (8th Cir. 2021) (finding that keeping identification for seven minutes did not constitute a seizure), cert. denied, 142 S. Ct. 1220 (2022); United States v. Barry, 394 F.3d 1070, 1074-75 (8th Cir. 2005) (determining that approaching a parked car, shining a light on the officer's uniform, keeping a hand on a holstered gun, and knocking on a passenger window was not a sufficient show of authority to rise to the level of a seizure).

Here, Officer Claborn asked for the driver's license early in the encounter, shortly after Rivers woke up. Officer Claborn's body camera recording reflects that it was merely a question, not a command. (See Gov't Exh. 1) See Lillich, 6 F.4th at 876 ("A request to see identification is not a seizure, 'as long as the police do not convey a message that compliance with their request is required.'") (quoting United States v. Vera, 457 F.3d 831, 835 (8th Cir. 2006) (cleaned up)). Furthermore, Officer Claborn was cordial and kept a calm tone throughout the encounter. Neither officer blocked in Rivers' car, nor did they command that he exit his vehicle at the time. The officers did not draw their weapons, and Rivers was not physically restrained or threatened with arrest or any other negative consequences. The undersigned finds that Rivers was not seized at the time Officer Claborn requested his identification.

The fact that the officers already had possession of the firearm does not change this

10

conclusion. As noted above, the fact that Rivers was asleep in a public place with a loaded firearm on his lap reflects dangerous and/or reckless conduct. In such circumstances, for officer and public safety, it was entirely reasonable to ascertain Rivers' identity before determining whether to return the gun to Rivers. See Harris, 747 F.3d at 1019 (explaining that the police were entitled to verify a person's identity before returning a firearm, suggesting that to do otherwise might "revive a dangerous situation"). Moreover, Rivers did not request the return of his firearm or ask to terminate the encounter and enter the hotel.

And even if Officer Claborn lacked reasonable suspicion before he asked for a driver's license, he had it once Rivers produced a Missouri Non-Driver Identification card and not a driver's license.[4] Again, Rivers was in a parked vehicle, and he advised Officer Claborn that he was tired after work. The reasonable and most likely inference is that Rivers lacked a driver's license and that he drove the vehicle he was in and parked it in the hotel lot. See United v. Gonzalez-Carmona, 35 F.4th 636, 640 (8th Cir.) (explaining that "any traffic violation, no matter how minor, is sufficient to provide an officer with probable cause.") (cleaned up), cert. denied, 143 S. Ct. 391 (2022). Again, as explained above, during a lawful car stop, the police can detain the driver while the officer conducts a criminal history check.

The undersigned finds that Officer Claborn did not violate Rivers' Fourth Amendment rights when he asked for a driver's license and conducted a criminal history and warrant check. Once Officer Claborn identified that Rivers had a felony conviction, he had probable cause to arrest him, although he did not do so immediately. Rather, he took additional steps, including asking dispatch to run a criminal history check and asking Rivers about his criminal history.

---

[4] At the hearing, Officer Claborn testified that Rivers was not free to leave after he took the non-driver's license and returned to his patrol car to run computer checks. (See Tr. at 23)

11

In summary, Officer Claborn did not unconstitutionally detain Rivers when he requested identification and did not return the firearm. To accept Rivers' position would lead to unworkable and dangerous conditions for officers who encounter unknown, armed persons in the middle of the night.[5] There is no reason to suppress the firearm seized during the encounter. For this reason, the undersigned does not believe it is necessary to consider the application of the attenuation doctrine, see Strieff, 579 U.S. at 238, in this case.[6]

As for the magazine seized from the glovebox, Rivers only argues that the magazine was the fruit of his unconstitutional seizure.[7] Having concluded that his seizure was sound under the Fourth Amendment, Rivers' fruit of the poisonous tree argument must be denied.

For the foregoing reasons, the undersigned recommends that the Court deny Rivers' Motion to Suppress Evidence.

### III. Motion to Suppress Statements

Rivers did not submit a motion to suppress statements before the deadline the Court set for

---

[5] Near the end of his post-hearing memorandum, Rivers contends that Officer Claborn engaged in a fishing expedition. The record before the Court refutes that contention. To the contrary, the encounter was reasonably precise and directed towards addressing the situation at hand; a situation that began with the discovery of a person asleep, passed out, or in distress in a parked car, with an open door, and a loaded firearm on his lap with an extended magazine.

[6] Although Officer Claborn testified that he observed warrants when he ran Rivers' information through his computer system, the record is not entirely clear as to the nature and status of those warrants. The record is limited to Officer Claburn's testimony that there were arrest warrants for Rivers out of the City of St. Louis. (See Tr. at 33) There is no evidence or testimony that the warrants were, in fact, active and valid at the time in question.

[7] Rivers does not contend that the search of his vehicle after his arrest was unconstitutional on its own terms. The government contends that the police had probable cause to conduct a warrantless search of the car pursuant to the automobile exception to the Fourth Amendment's warrant requirement. See, e.g., United States v. Crawford, 93 F.4th 436, 440 (8th Cir. 2024) ("For an automobile or other vehicle, the general rule is that officers may conduct a search, without a warrant, if they have probable cause to believe that evidence of a crime or contraband will be found inside.") (citation omitted).

filing pretrial motions. Rather, during the evidentiary hearing on his motion to suppress evidence, Rivers made an oral motion to suppress the statements he made in response to Officer Claborn's questions after he was detained but before he was formally arrested. In particular, after Officer Claborn discovered that Rivers had a prior conviction, he asked dispatch to confirm the conviction. While waiting on confirmation, Officer Claborn ordered Rivers out of the vehicle, placed him in handcuffs, and advised him that he was being detained. During this time, Officer Claborn did not provide Miranda warnings, yet he asked Rivers questions concerning his criminal history, including if he was aware that he could not possess a firearm. Rivers answered those inquiries and was immediately arrested. In his post-hearing memorandum, Rivers contends that his answers to those questions were the fruit of the unlawful seizure of his person. Rivers also makes a passing reference to Miranda but does not specifically argue why, prior to his formal arrest, he was entitled to Miranda warnings. The government contends that, because Officer Claborn lawfully detained Rivers, any fruit of the poisonous tree argument must fail. The government also does not squarely address the Miranda issue.

Because Rivers' detention was constitutionally sound, his fruit of the poisonous tree argument is frustrated and cannot be sustained. As for Miranda, the simple fact that he was detained does not necessarily lead to a conclusion that Miranda warnings were necessary. Miranda warnings are not required for all police questioning. Rather, such warnings are only mandated during custodial interrogation. See United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). "Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody." Illinois v. Perkins, 496 U.S. 292, 296 (1990) (cleaned up).

As noted above, Rivers mentions Miranda only in passing, but he does not substantially develop his argument. Thus, he has arguably forfeited this issue. See United States v. Caldwell,

13

954 F.2d 496, 500 (8th Cir. 1992) (finding that a defendant filed to preserve a Miranda issue where, inter alia, he raised the general issue but failed to explain why the warnings given were inadequate). Nonetheless, to make a more complete record for review, the undersigned will consider the Miranda issue as if it has been adequately presented for our Court's review.[8]

In this case, there is no dispute that Rivers was detained when Officer Claborn questioned him about his criminal history, as he was removed from his car and placed in handcuffs. But at that point he had not yet been formally arrested, and an investigatory detention does not necessarily rise to the level of an arrest. Stated differently, the fact that Rivers was restrained and detained does not necessarily dictate that Miranda warnings were required because detention and custody are not co-extensive in the Terry context. See United States v. Martinez, 462 F.3d 903, 908 (8th Cir. 2006) ("Whether [a defendant] was 'in custody' for purposes of Miranda after being handcuffed during [a] Terry stop is a separate question from whether that handcuffing constituted an arrest for which probable cause was required."). Yet the Eighth Circuit has seemingly rejected a blanket rule that Miranda warnings are never required during a Terry stop. Id. at 909-10 (noting that most "Terry stops do not trigger the detainee's Miranda rights," and implying that some might trigger such rights) (quoting United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003)).

In determining whether a person is "in custody" for Miranda purposes where there has been no formal arrest, a reviewing court must consider "the totality of the circumstances," focusing on

---

[8] At no point does Rivers contend that his statements to Officer Claborn were involuntary. See United States v. Esey, 595 F.3d 836, 839 (8th Cir. 2010) (discussing voluntariness standard) (citations omitted). And the undersigned has viewed the body camera recording (Gov't Exh. 1), which demonstrates that Rivers' statements were voluntary. In fact, as discussed elsewhere herein, Rivers was talkative and made many spontaneous statements that were not in response to any official questioning and, therefore, not subject to Miranda. See Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980); United States v. Bailey, 831 F.3d 1035, 1038 (8th Cir. 2016) ("Voluntary statements unprompted by interrogation are admissible with or without Miranda warnings.") (citation omitted).

14

"the objective circumstances" and not the "subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 322-23 (1994). "Absent formal arrest, the police must give Miranda warnings when a suspect's freedom of movement is restricted to a degree akin to a formal arrest." United States v. Roberts, 975 F.3d 709, 716 (8th Cir. 2020) (citation omitted), cert. denied, 141 S. Ct. 2822 (2021). In this regard, the Eighth Circuit often turns to six so-called "Griffin" factors, to determine whether a person is in custody for Miranda purposes. The six Griffin factors are as follows:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of questioning.

United States v. Ferguson, 970 F.3d 895, 901 (8th Cir. 2020) (quoting United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)). "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning." United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002). "[T]he last three indicia are aggravating factors which, if present, aggravate the existence of custody." Id. at 501. These are not the exclusive factors and "a particularly strong showing of one factor may compensate for a lesser or non-existent showing of another factor." Id.

The first factor is largely neutral. Although Officer Claborn did not tell Rivers that his questions were voluntary and Rivers was not free to go, Officer Claborn's body camera recording reflects that he advised Rivers that he was merely being detained and not arrested. The second factor weighs squarely in favor of Rivers. Rivers was handcuffed and not free to leave. The third

15

factor weighs in favor of Rivers as well. Rivers did not initiate contact with the police, and Officer Claborn did not ask him if he was willing to answer any questions before asking about his criminal history. The fourth factor weighs strongly in favor of the government. The police officers did not employ any deception or strong arm tactics whatsoever. Rather, the officers engaged with Rivers in a calm and cordial manner during this time. The fifth factor is generally neutral. Although there were two officers present, the record before the Court reflects that it was only Officer Claborn who substantially interacted with Rivers.[9] The officers did not draw their weapons and did not box in Rivers. They did not raise their voices and did not move or restrain Rivers until it became possible that he possessed the firearm unlawfully. The sixth factor weighs in favor of Rivers—he was arrested immediately after he confirmed his criminal history and that he knew he could not possess a firearm.[10]

Applying these factors in this case, the undersigned finds that Rivers was in custody for Miranda purposes after he was removed from the car and handcuffed while awaiting confirmation of his felony conviction. Therefore, assuming Rivers preserved the Miranda issue, his initial statements to Officer Claborn confirming his criminal history should be suppressed. This

---

[9] Officer Cayabyab's body camera recording, if any exits, was not offered or admitted into evidence. Thus, although Officer Cayabyab stayed with Rivers while Officer Claborn conducted his computer inquiry, his specific interactions with Rivers are not before the Court for consideration.

[10] The Eighth Circuit has questioned whether the fact of arrest is particularly relevant under an objective inquiry when the arrest occurs at the end. See United States v. Treanton, 57 F.4th 638 (8th Cir. 2023). The fact of arrest does not necessarily indicate that an arrest was inevitable or anticipated at the outset. In the instant case, however, the record tends to support a conclusion that an arrest was anticipated and inevitable. Officer Claborn testified that he believed he had probable cause based on his computer inquiry, but he was waiting on confirmation. (See Tr. at 25) Based on the body camera recording (Gov't Exh. 1), the undersigned finds that Officer Claborn arrested Rivers after Rivers' statements but shortly before dispatch confirmed his felony conviction.

16

conclusion is largely academic, however, because Rivers continued to make spontaneous statements regarding his status, including his criminal history, after he was formally arrested. Those spontaneous statements need not be suppressed because they were not made in response to any police questioning. In other words, even assuming that Rivers preserved his Miranda arguments, and his initial statements to Officer Claborn concerning his criminal history must be suppressed, the government can use Rivers' later voluntary and spontaneous statements, including his statements after he was captured following his escape from the police vehicle.

In summary, the undersigned finds that, because there was no unconstitutional detention, none of Rivers' statements to the police reflect the fruit of the poisonous tree. But assuming that Rivers preserved his Miranda argument relative to Officer Claborn's questions to him after being removed from the car and handcuffed, the undersigned finds that Rivers was in custody and entitled to Miranda warnings. Therefore, his answers to Officer Claborn's questions regarding his felony conviction should be suppressed. Rivers' later, volunteered and spontaneous statements to Officer Claborn addressing and referencing his criminal history need not be suppressed, even if there was a Miranda violation.

## RECOMMENDATIONS

Accordingly,

**IT IS HEREBY RECOMMENDED** that the Court DENY the Motion to Dismiss [ECF No. 32].

**IT IS FURTHER RECOMMENDED** that the Court DENY the Motion to Suppress Evidence [ECF No. 33].

**IT IS FURTHER RECOMMENDED** that the Court GRANT the Oral Motion to Suppress Statements [ECF No. 39], insofar as that motion relates to the statements Rivers made

immediately after he was handcuffed, but not insofar as it relates to his later spontaneous statements concerning his circumstances, including those implicating his criminal history and possession of a firearm.

**IT IS ORDERED** that the parties are required to retain all exhibits received into evidence during the evidentiary hearing in this matter and shall retain said exhibits until the time for filing a Notice of Appeal has expired.

The parties are advised that they have fourteen (14) days in which to file written objections to the foregoing Report and Recommendation unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require review by a District Court Judge. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990). See also 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a).

Pretrial proceedings in this matter have concluded. This matter will be set for trial by further order of the court, before the Honorable Maria A. Lanahan, United States District Judge.

JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this   6th   day of   January  , 2026.